CARLTON FIELDS, P.A.
Benjamin M. Stoll (*pro hac vice*)
1625 Eye Street NW #800
Washington, DC 20006
Phone: 202-965-8160
bstoll@carltonfields.com

NCP LAW, PLLC
Andrea S. Tazioli (AZ Bar No. 026621)
3200 N. Central Avenue
Suite 2550
Phoenix, AZ 85012
Phone: (602) 428-3010
andrea@ncplawyers.com

*Attorneys for Defendant CoinMarketCap OpCo, LLC*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Cox, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CoinMarketCap OpCo, LLC; BAM Trading Services Inc. d/b/a Binance.US; and Does I-X;<br><br>　　　　Defendants. | Case No. 3:21-cv-08197-SMB<br><br>**DEFENDANT COINMARKETCAP OPCO, LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT** |

#117260.1

1   All of Cox's claims rest on the same fundamental allegation that CMC has been improperly ranking cryptocurrencies on its website. Cox's complaint should be dismissed with prejudice because this core allegation runs headlong into the Communications Decency Act ("**Section 230**"), which bars all claims based on how a website decides to present and curate third-party information, like the cryptocurrency data CMC obtains from other sites and sources and displays on its home page. Because the gravamen of Cox's claims involves the way CMC presents third-party information, those claims are dead on arrival and no amount of amending can possibly resuscitate them.

Additionally, Cox alleges that since September 2020 CMC has been falsely representing on its website that it ranks all cryptocurrencies based *solely* on their market capitalizations ("**market cap**"). This allegation is implausible on the face of CMC's *About* page (attached as **Exhibit 1**), which Cox relies upon in his First Amended Complaint ("**FAC**").[1] FAC ¶¶ 14, 20, 25, 69, 200, 217, 255 (all quoting CMC's *About* webpage); *see also* ECF No. 108 ("**Opp. Br.**") at 2 (same). Contrary to Cox's allegations, CMC's *About* page does not state that CMC ranks cryptocurrencies based solely on market cap. To the contrary, even before the Suppression Period, the *About* page included the following description of CMC's ranking policies:

---

[1] Cox quotes CMC's *About* page, so the "court may treat [it] as part of the complaint and thus may assume that [its] contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *SinglePoint Direct Solar LLC v. Curiel*, 2022 WL 331157, at *3 (D. Ariz. Feb. 3, 2022) (citation omitted). Courts now customarily take judicial notice of webpage archives from the Wayback Machine. *Erickson v. Neb. Mach. Co.*, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015) ("Courts have taken judicial notice of the contents of web pages available through the [] Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1194 (W.D. Wash. 2024) (collecting cases); *World Nutrition Inc. v. Advanced Enzymes USA*, 2019 WL 5802001, at *2 (D. Ariz. Nov. 7, 2019) (taking judicial notice of Wayback Machine archives).

#117260.1

- CoinMarketCap strictly follows and enforces its independent *listing criteria guidelines*, circulating *supply calculation methods* and *liquidity score* for how it ranks cryptoassets[; and]

- CoinMarketCap's official *ranking criteria* is designed to eliminate any possibility of preferential treatment in general, even for the Binance exchange or BNB cryptoasset.

Exhibit 1.[2]  Clicking on the *ranking criteria* link takes one to the *Ranking* page, attached as **Exhibit 2**,[3] which states that:

> [A] project's eligibility for a Top 200 Cryptoasset Rank will now be determined by market capitalization and the following factors:
> 1. Our ability to verify the project's supply information with no incongruities
> 2. Strengths in a number of areas of Listings Review Criteria's *Section C (Evaluation Framework)* below
> 3. Significant liquidity/trading activity with normal bid-ask spreads across sufficient sources of market data
> 4. Absence of significant price discrepancies across CMC-supported exchanges
> 5. The asset is traded on at least three non-decentralized exchanges that possess a number of the following attributes:  publishes granular API endpoints[;] Active product development and communications from the team[;] Active/engaged community of a considerable size[;] Accredited/Audited by a credible 3rd party[;] DATA Partner[; and] Regulated/Licensed.

Clicking on the *Section C (Evaluation Framework)* link takes one to the *Listing Criteria* page (also linked on the *About* page), attached as **Exhibit 3**, which lists eight more non-market-cap ranking criteria.  Thus, the *About* page clearly conveys that CMC employs a complex multi-factor ranking algorithm, not a single "market-cap only" ranking system.

---

[2] Exhibit 1 reflects the *About* page as it existed on September 19, 2020, which predates the alleged Suppression Period beginning between September 20 and 27, 2020.  FAC ¶¶ 85–86.

[3] *See Abboud v. Circle K Stores Inc.*, 731 F. Supp. 3d 1094, 1100 (D. Ariz. 2024) (incorporating hyperlinked webpage within document relied on in complaint).  Not every webpage is archived every day, and the *Ranking* page was not archived on September 19, 2020.  Exhibit 2 shows the *Ranking* page as it existed on September 25, 2020, the closest available date to September 19, 2020.

#117260.1

Cox's claim that CMC began suppressing HEX's rank around September 20, 2020, by removing HEX from its homepage is also belied by CMC's homepage itself. Like CMC's *About* page, CMC's homepage is cited and screenshotted in the FAC and therefore may be considered on a motion to dismiss. FAC ¶¶ 45, 78–80, 87; *A.S. v. SelectQuote Ins. Servs.*, 2024 WL 3881850, at *3–4 (S.D. Cal. Aug. 19, 2024) (incorporating websites referenced in complaint and finding that "[t]he incorporation-by-reference doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."). Archives of CMC's homepage are attached as the page existed on January 1, 2020 (**Exhibit 4**); February 1, 2020 (**Exhibit 5**); March 1, 2020 (**Exhibit 6**); April 1, 2020 (**Exhibit 7**); July 1, 2020 (**Exhibit 8**); September 1, 2020 (**Exhibit 9**); and September 19, 2020 (**Exhibit 10**).[4] HEX does not appear on CMC's homepage in any of these screenshots, all of which were taken <u>before the alleged Suppression Period</u>. *See* Exhibits 4–10; FAC ¶¶ 16, 20. This is because HEX did not qualify for inclusion in the top 200 cryptocurrencies under CMC's ranking criteria even before the Suppression Period, and even before Cox alleges Binance acquired an interest in CMC in April 2020. FAC ¶¶ 16, 18, 20. This renders Cox's entire suppression theory implausible, justifying dismissal of all claims with prejudice.

But even if Cox's allegations were not clearly belied by the exact documents he quotes and relies upon, his claims are all irredeemably legally deficient under the relevant statutes. For his CEA claim, Cox's alleged spot market sales of HEX are neither "interests in a commodity pool" nor "contract[s] of sale of any commodity for future delivery," so he has no private right of action against CMC. For his ACFA claim, Cox does not allege any personal reliance or factually false statement on CMC's website. For his Sherman Act claims, Cox alleges neither restraint in a market where CMC and Hex compete (antitrust market), nor an injury in a market where competition was restrained (antitrust injury).

---

[4] CMC requests the Court take judicial notice of these archives. *See supra* note 1.

3

#117260.1

Cox has had four years to hone his allegations and an opportunity to amend. Yet, those allegations remain implausible and internally inconsistent. All his claims arise from a misrepresentation theory belied by the very CMC webpages upon which he relies. *Lynch v. Express Scripts Holding Co.*, 2025 WL 2224419, at *3 (N.D. Cal. Aug. 5, 2025) ("When a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling." (quoting *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 n.1 (9th Cir. 2023))). As a result, the FAC should be dismissed with prejudice.

## ARGUMENT

### I. COX'S CLAIMS ARE BARRED BY SECTION 230 OF THE CDA.

Cox does not dispute that Section 230 bars claims arising from publishing third-party content. Opp. Br. at 17 ("Cox does not seek to hold CMC liable for publishing third party content"); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02, 1105 (9th Cir. 2009). But publishing third-party content is precisely what CMC is doing. CMC does not—and could not—generate price and volume data for cryptocurrencies itself. Instead, CMC curates and publishes cryptocurrency information it receives from other sites and sources. The law is unambiguous that this type of data—equivalent to stock prices and volumes—is third-party content. *Ben Ezra, Weinstein & Co. v. AOL*, 206 F.3d 980, 985–86 (10th Cir. 2000).

Section 230 protects CMC from all of Cox's claims because they all hinge on Cox's objection to where and how CMC decides to present HEX's pricing information on its website, specifically CMC's decision not to present HEX's information on CMC's homepage. FAC ¶¶ 79–80, 90–91, 104. This is precisely the type of "subjective, editorial decision" about where and how to show (or not show) third-party content that Section 230 is intended to protect. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096, 1098 (9th Cir. 2019). In fact, Section 230(c)(1) specifically covers a website's decision to remove, screen, or hide content, which is exactly what Cox accuses CMC of doing. *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (*en banc*) ("[A]ny activity that can be boiled down to deciding whether to

#117260.1

exclude material . . . is perforce immune under section 230."). As a result, Section 230 bars Cox's claims and requires dismissal of his Complaint with prejudice. *See Sikhs for Just., Inc. v. Facebook, Inc.*, 697 F. App'x 526, 526 (9th Cir. 2017).

## II. COX FAILS TO PLAUSIBLY ALLEGE A VIOLATION OF THE CEA.

<u>First</u>, the CEA's private right of action does not extend to the spot market HEX trades that Cox conducted. Cox tries to avoid this inevitability by suggesting HEX could be a trading pool or contract for future delivery. Opp. Br. at 5–6. Plainly, HEX is neither, and Cox cites no case in which any court allowed a private right of action under the CEA for the type of spot market cryptocurrency trades Cox alleges he made. FAC ¶¶ 10–11.

A Commodity Pool is an "investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests," 7 U.S.C. § 1a(10), or the "the commodity-futures equivalent of a mutual fund," *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 965 (7th Cir. 1986). HEX is not a mutual fund or "enterprise" at all. HEX is a commodity, not a commodity pool. Regardless, the private right of action under the CEA only extends to the operators of such pools. *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 186–88 (3d Cir. 2000). CMC is not the operator of HEX, so Cox has no private right of action against CMC under the CEA.

Cox's assertion that his HEX trades could be futures contracts is equally spurious because the FAC does not allege Cox ever contracted for future—rather than immediate—delivery of HEX.[5] And even if Cox had traded futures contracts, his theory of liability against CMC would still fail because Cox does not allege that CMC published or suppressed the prices of HEX futures. Instead, CMC only publishes spot prices. The fact that HEX can be "staked"[6] does not change this outcome. Staking—and other lock-up

---

[5] *See* 7 U.S.C. 1a(27) (excluding mere delayed deliveries from the term "future delivery").

[6] *See Samuels v. Lido Dao*, 757 F. Supp. 3d 951, 957–58 (N.D. Cal. 2024) (explaining staking mechanism).

5

mechanisms—affect whether and when you can sell an asset, not when you take ownership of it. *See Berk v. Coinbase, Inc.*, 2018 WL 5292244, at *2 (N.D. Cal. Oct. 23, 2018).

<u>Second</u>, Cox fails to plausibly allege that CMC caused a decrease in the price of HEX, especially since CMC does not even link to a place where one can trade it. Cox reiterates his allegation that CMC is "the most-relied-upon cryptocurrency ranking website," Opp. Br. at 7, but that does not mean CMC's rankings impact trading volumes. Cox's own allegations contradict such a causation theory. For example, Cox alleges that institutional investors—*i.e.*, high volume traders that can move prices—have "spurned" CMC and do not use it. FAC ¶ 21; Opp. Br. at 2. And Cox's discussion of the economic concept of a liquidity premium, Opp. Br. at 7–8, is irrelevant because Cox concedes that HEX is "heavily traded," FAC ¶ 115, implying it has plenty of liquidity and sellers do not need to offer a discount to attract buyers. Given this liquidity, there is no reason a higher ranking from CMC would motivate buyers to buy HEX more than it would motivate sellers to sell HEX. If both buyers and sellers are equally influenced by CMC's rankings—and Cox provides no reason to believe otherwise—CMC's rankings would not alter the relative supply and demand of HEX and therefore would not alter its price.

<u>Third</u>, Cox fails to plausibly plead that HEX had an "artificial price." Cox alleges that HEX's price during the Suppression Period was artificial because it was altered by a false statement CMC made about HEX in the form of a ranking different than what HEX would have had based on market cap alone. Opp. Br. at 8–9. But CMC never made a false statement about HEX because CMC's rankings are an opinion. ECF No. 107 ("**Motion**") at 6. Regardless, CMC never stated that its rankings were based <u>solely</u> on market cap. To the contrary, the CMC webpages Cox relies upon in the FAC—CMC's *About* page and homepage—establish that CMC used a multi-factor algorithm to rank cryptocurrencies. Cox does not allege CMC failed to abide by this algorithm with respect to the ranking of

#117260.1

HEX or any other cryptocurrency.⁷  Since CMC made no false statement, even if its rankings impacted the price of HEX, that price would not be "artificial."

Fourth, Cox fails to create a "strong inference" that the "dominant purpose" of CMC's rankings was to harm HEX, as required to plausibly plead intent. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535–36 (S.D.N.Y. 2008). Cox's only factual allegation for such intent is that HEX competed with Binance's cryptocurrencies, thereby giving <u>Binance</u> a general profit motive to harm HEX. But every company has a profit motive to harm its competitors, so that by itself cannot be enough to plausibly infer an intent to commit a tort. *See Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) ("[A] generalized motive that could be imputed to any for-profit endeavor [is] not sufficiently concrete for purposes of inferring *scienter*." (emphasis in original)). Regardless, Cox cannot simply attribute Binance's intent to CMC without piercing the corporate veil, which he does not even attempt to do. Cox therefore fails to plausibly imply that CMC itself had the requisite scienter for a CEA violation.

Fifth, Cox fails to plausibly allege that he suffered harm as a result of the HEX price suppression he alleges. Cox argues he is not alleging bidirectional manipulation, Opp. Br. at 12–13, but CMC never suggested he was. Instead, CMC explained that if Cox purchased more HEX than he sold during the Suppression Period, then he would have benefited from the alleged suppression. Motion at 8. Despite four years of litigating this case, the FAC

---

⁷ Cox argues it is unclear why CMC attached archives of its *About*, *Ranking*, and *Listing Criteria* pages to its Motion, but the reason is crystal clear: Cox relies on these documents, so they are incorporated into his FAC, and the face of these documents definitively establishes that CMC was not ranking cryptocurrencies based solely on market cap, thereby rending Cox's entire case implausible. On reply, CMC separates these pages into separate exhibits and proffers them from dates prior to or at the very beginning of the alleged Suppression Period in order to clarify precisely what page is being archived on what day and to show that CMC's representations regarding its ranking criteria predate the Suppression Period. These pages are not "buried" or hard to find as Cox asserts in his opposition brief. Opp. Br. at 10, 12. Cox himself quotes the *About* page, which is linked from the bottom of CMC's homepage. The *About* page contains prominent links to the *Ranking* and *Listing Criteria* pages.

1  still does not include sufficient detail regarding how much HEX Cox traded and when to
2  plausibly establish that Cox was actually injured under his own theory of liability.

### III.    COX FAILS TO PLAUSIBLY ALLEGE A VIOLATION OF THE ACFA.

Cox's ACFA claim lacks a plausible allegation of a false statement, personal reliance, or an advertisement, all of which are required for an ACFA claim. *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 953 (Ariz. 2016).

First, while Cox claims CMC should have been ranking HEX and other cryptocurrencies solely based on their market caps, Cox does not—and cannot—point to any place where CMC actually stated that its ranking were based solely on market cap. Before and during the alleged Suppression Period, CMC clearly explained its ranking criteria, which included not just market cap but many other factors. Exhibits 1–3. Thus, Cox has not plausibly pleaded a false statement. Cox cannot build his case on the purely fabricated allegation that CMC was purporting to rank cryptocurrencies solely by market cap when that allegation is contradicted by the very *About* page on which he relies. *See Lynch*, 2025 WL 2224419, at *3. Cox alleges that CMC entitled its rankings "Today's Cryptocurrency Prices by Market Cap," Opp. Br. at 13, but the archives of CMC's homepage establish that this was not the case during, or even before, the Suppression Period. By July 2020 (three months before the Suppression Period), the title above the rankings on CMC's homepage was "Top 100 Cryptocurrencies by Market Capitalization," which accurately conveys that the Top 100 cryptocurrencies on the homepage were arranged by their respective market caps. *See* Exhibit 8. And any ambiguity regarding this title is clarified by CMC's *About* page which clearly describes the criteria CMC uses to rank cryptocurrencies. There was no materially false statement and therefore no basis for an ACFA claim.

Second, even if Cox could plausibly allege a false statement, he does not allege he relied upon it. Cox does not allege that he personally relied upon, or ever even saw, CMC's rankings, let alone around the time he was purchasing and selling HEX. This is fatal to his ACFA claim, which requires personal reliance. *Theodosakis v. Clegg*, 2017 WL 1294529,

8

at *20–21 (D. Ariz. Jan. 30, 2017). Cox asks for leave to amend on this issue, but no new allegation could establish reliance. If Cox pleads that he relied on CMC's website when purchasing HEX, then that reliance occurred *prior* to the Suppression Period, and therefore prior to any alleged false statement. And if Cox pleads that he relied on CMC's website during the Suppression Period, that would necessitate the nonsensical inference that Cox was motivated to *sell* HEX because of its artificially *low* price. In short, because Cox sold, not purchased, during the alleged Suppression Period, he cannot plausibly plead personal reliance on CMC's website.

Third, Cox does not plausibly plead any connection between CMC's rankings and any advertisement. There is no factual dispute here—the parties agree that CMC was simply listing price information for cryptocurrencies on its website. And Cox cannot turn these listings into advertisements by fiat. Nothing about these listings could reasonably be construed as an attempt to "induce" anyone to buy any particular cryptocurrency or even cryptocurrencies in general. Just like a stock ticker under a TV news program (which now often include cryptocurrency prices) or stock listings in a newspaper, CMC's listings are not advertisements. Cox even quotes CMC's statement that it is a "price-tracking website for cryptoassets" with the goal of "empowering retail users with unbiased, high quality and accurate information for drawing their own informed conclusions." FAC ¶ 14. This is not an attempt to induce anyone to do anything. If it were, then every Google results page would be an advertisement for the websites Google lists. That is clearly not the case.

Since Cox cannot plausibly plead a false statement, personal reliance, or a connection to an advertisement, his ACFA claims fail as a matter of law.

**IV. COX FAILS TO PLAUSIBLY ALLEGE A SHERMAN ACT VIOLATION.**

A Sherman Act Section 2 claim requires, at a minimum, an antitrust market, exclusionary conduct, and an antitrust injury. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F.Supp.3d 1123, 1136–37 (2014), *aff'd,* 836 F.3d 1171 (9th Cir. 2016). Cox has plausibly pleaded none of these.

#117260.1

First, Cox alleges the relevant antitrust market is "the market for cryptocurrency ranking and information services," FAC ¶ 154, Opp. Br. at 16, but this market is incongruous with his antitrust claims against CMC. Nothing about CMC's alleged suppression of HEX would help CMC monopolize the market for cryptocurrency ranking and information services. Any impact of the alleged suppression would be felt in the totally different market for HEX itself, a market CMC does not participate in and certainly is not monopolizing or attempting to monopolize. Thus, Cox has not even defined a plausible antitrust market for his antitrust claims.

Second, the alleged suppression of HEX's ranking is not "exclusionary conduct"—it is not an attempt to restrain competition—so it is not a violation of Section 2 of the Sherman Act. *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 432 F. Supp. 3d 1070, 1091–92 (D. Ariz. 2020). Nothing about CMC's alleged suppression of HEX's ranking harms *competition*, let alone competition in the antitrust market for cryptocurrency ranking and information services. Thus, even if his suppression theory were correct, Cox's invocation of the Sherman Act is misplaced and inappropriate.

Third, while Cox makes the conclusory statement that CMC's alleged "wrongdoing affected competition as a whole," Opp. Br. at 16, this is not the test for establishing antitrust injury. Instead, a plaintiff suffers an antitrust injury only if he is personally harmed "in the market where competition is being restrained." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999). Cox does not participate in the market for crypto ranking and information services—he does not buy or sell these services, nor does he allege he even saw CMC's rankings—so he was not injured in this market. Therefore, he has not suffered an antitrust injury and cannot bring antitrust claims under the Sherman Act.

The Court should reject Cox's inartful attempt to hammer a square false statement allegation into a round antitrust cause of action.

## V.  ANY AMENDMENT WOULD BE FUTILE

Cox asks the Court for a second chance to amend, Opp. Br. at 17, but no amendment can fix his claims' numerous fatal flaws. The Court's discretion in denying leave to amend

here "is particularly broad" because Cox "has previously filed an amended complaint." *Zunum Aero, Inc. v. Boeing Co.*, 2022 WL 3346398, at *11 (W.D. Wash. Aug. 12, 2022). The fact that the court has not yet ruled on CMC's 12(b)(6) arguments is not dispositive. *See Del Valle v. Trivago GMBH*, 2023 WL 5141699, at *6 (S.D. Fla. Aug. 10, 2023), *aff'd*, 2025 WL 1443951 (11th Cir. May 20, 2025) (dismissing case for failure to state claim with prejudice after reversal of prior dismissal for lack of personal jurisdiction where all amendments occurred before dismissal for failure to state claim).

Cox does not proffer any new allegations that could be added to the FAC to fix any of the flaws in his claims. *See Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011) (holding amendment was futile where plaintiff failed to propose "specific allegations that might rectify" his deficiencies); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir. 2008) ("Appellants fail to state what additional facts they would plead if given leave to amend. . . . Accordingly, amendment would be futile."). And any amendment here would clearly be futile. Nothing Cox could add in an amendment can change the fact that his claims are barred by Section 230, that he has no private right of action under CEA, that he never suffered an antitrust injury, and that CMC never stated it was ranking cryptocurrencies solely based on market cap. And no amendment could change the fact that HEX did not appear on CMC's homepage even before the Suppression Period (and before Cox alleges Binance purchased an interest in CMC), which makes all of Cox's claims implausible. Any new allegations Cox might add by amendment would inevitably be inconsistent with this fundamental fact. *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990) (denying leave to amend where plaintiff would be required to allege a new inconsistent theory of harm).

The FAC should be dismissed with prejudice.

#117260.1

RESPECTFULLY SUBMITTED this 17th day of October, 2025.

/s/ Benjamin M. Stoll
Benjamin M. Stoll (*pro hac vice*)
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Phone: (202) 965-8160
Email: bstoll@carltonfields.com

- and -

Andrea S. Tazioli (Ariz. Bar No. 026621)
NCP LAW, PLLC
3200 N. Central Ave., Suite 2550
Phoenix, AZ 85012
Phone: 602-428-3010
Email: andrea@ncplawyers.com

*Attorneys for Defendant CoinMarketCap OpCo, LLC*

#117260.1

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2025, I electronically transmitted the foregoing document to the Clerk of the Court through the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF registrants for this matter.

/s/ Andrea S. Tazioli

#117260.1