**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Cox,<br><br>                    Plaintiff,<br><br>v.<br><br>CoinMarketCap OpCo LLC, et al.,<br><br>                    Defendants. | No. CV-21-08197-PCT-SMB<br><br>**ORDER** |

The Court now considers Defendant BAM Trading Services Inc. d/b/a Binance.US's ("BAM") Motion to Dismiss (Doc. 106) and Defendant CoinMarketCap OpCo., LLC's ("CMC") Motion to Dismiss (Doc. 107). The Motions have been fully briefed. For the following reasons, the Court **grants** BAM's and CMC's Motions. The Court gives Plaintiff leave to amend their Amended Complaint.

**I.     BACKGROUND**

Plaintiff Ryan Cox, an Arizona resident, filed the present putative class action alleging violations of the Commodity Exchange Act ("CEA"), the Arizona Consumer Fraud Act ("ACFA"), and the Sherman Act. (Doc. 105.) Plaintiff alleges that BAM and CMC used "various unlawful means to artificially suppress the value of HEX"—a cryptocurrency. (*Id.* at 1–2 ¶ 3.) The Amended Complaint alleges as follows.

CMC operates "the world's most-referenced price-tracking website for cryptoassets." (*Id.* at 4 ¶ 14.) CMC is owned by Digital Anchor Holdings Ltd. a cryptocurrency exchange formerly known as Binance Capital Management Co., Ltd. (*Id.*

at 2 ¶ 5.) BAM, Digital Anchor's United States affiliate, is a cryptocurrency exchange affiliated with CMC. (*Id.*) Generally, websites like CMC "generate revenue by linking consumers with affiliated exchanges"—like BAM—"where [consumers] can buy and sell cryptocurrencies." (*Id.* at 3 ¶ 7.) Thus, consumers go to websites like CMC "to find links to exchanges where they can trade their [cryptocurrencies]." (*Id.*)

CMC provides an assessment of various cryptocurrencies' market capitalization, which "is calculated by multiplying the price of a cryptocurrency with its circulating supply at any given time." (*Id.* at 18 ¶ 73; 21 ¶ 82.) CMC then "ranks cryptocurrencies on the basis of their overall market cap in comparison to those of other cryptocurrencies." (*Id.* at 21 ¶ 82.) As of September 20, 2020, CMC ranked HEX as having the 20th highest market cap. (*Id.* at 21 ¶ 85.)

However, on September 27, the "Suppression Period" began, during which, HEX's ranking dropped to 201st despite being "the best performing cryptocurrency of 2020." (*Id.* ¶¶ 83, 86.) CMC refused to adjust HEX's ranking and thus "locked" it. (*Id.* ¶¶ 83, 87.) This "caused HEX to trade at lower prices than it would have had the ranking not been locked" because "[t]he higher a cryptocurrency is ranked, the higher up it appears on the homepage of [CMC's] website for interested users to purchase." (*Id.* ¶¶ 89–90.)

The Amended Complaint goes on to allege that CMC's refusal to adjust HEX's ranking persisted into 2021. (*Id.* at ¶ 100.) HEX's market cap should have had it ranked anywhere from 3rd to 6th on CMC; however, HEX's ranking remained at 201st. (*Id.* ¶¶ 100-103.) HEX was ranked between 4th and 10th on other price-tracking websites. (*Id.* at 23 ¶ 106.) This resulted in "institutional and retail investors" not purchasing HEX. (*Id.* ¶¶ 107, 112.) CMC is alleged to have locked HEX's ranking to "artificially inflate[] the value of some or all of the cryptocurrencies ranked above HEX," which included cryptocurrencies issued by Digital Anchor such as Binance Coin. (*Id.* at 24 ¶ 114.)

Plaintiff alleges that HEX posed a threat to CMC and BAM because it "is designed to generate interest when 'staked', [sic] which discourages active trading."[1] (*Id.* at 25

---

[1] Cryptocurrencies are tracked on a ledger known as a blockchain which generates new units through consensus mechanisms such as "proof of stake." *See* Doretha Clemon,

¶ 132.)  If the "HEX model succeed[ed]" it would undermine businesses like BAM and CMC insofar as those businesses "make money only when an investor trades." (*Id.*)

Accordingly, Plaintiff asserts claims under the CEA, ACFA, and the Sherman Act. The Court now considers BAM's and CMC's Motions under Federal Rule of Civil Procedure ("Rule") 12(b)(6).

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Rule 8(a)(2).  Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  This notice exists if the pleader sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  Plausibility does not equal "probability," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility . . . .'"

---

*Understanding Proof-of-Stake: How PoS Transforms Cryptocurrency*, Investopedia (August 6, 2025) https://www.investopedia.com/terms/p/proof-stake-pos.asp.  Staking involves owners offering up their units as collateral to qualify themselves to be selected as a "validator."  *See id.*; *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 297–98 (S.D.N.Y. 2024) (describing "proof of stake" which is "an essential component of many blockchains' consensus protocols, which, among other things, are necessary to achieve agreement among users as to a data value or as to the state of a ledger on a given blockchain").

- 3 -

1   *Id.* (quoting *Twombly*, 550 U.S. at 557).

2   In ruling on a Rule 12(b)(6) motion to dismiss, the well-pleaded factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). A court ordinarily may not consider evidence outside the pleadings when ruling on a Rule 12(b)(6) motion to dismiss. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

## III.   DISCUSSION

As noted, Plaintiff asserts claims under the CEA, the ACFA, and the Sherman Act. The Court considers each set of claims in turn.[2]

### A. Commodity Exchange Act (Counts I and II)

The Court begins with Plaintiff's CEA claims. (Doc. 106 at 33 ¶¶ 181—182.) Plaintiff asserts a CEA manipulation claim against BAM and CMC and a CEA strict liability claim against BAM. The Court dismisses both claims without prejudice.

"The CEA prohibits manipulation of the price of any commodity or commodity future." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (citing 7 U.S.C. §§ 9(1), 13(a)(2)). Manipulation exists "where (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price."

---

[2] The Ninth Circuit reversed this Court's previous Order dismissing the case against CMC and BAM for lack of personal jurisdiction. *See Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822 (9th Cir. 2024). BAM contends, however, that Plaintiff's ACFA and Sherman Act claims remain dismissed because Plaintiff did not challenge the dismissal of those claims on appeal. (Doc. 106 at 10.) However, this Court vacated its Order dismissing the claims asserted against CMC and BAM (Doc. 97) and personal jurisdiction otherwise exists under the doctrine of pendent personal jurisdiction. *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).

*Id.* (citation modified).

Plaintiff alleges that CMC manipulated the price of HEX by inaccurately reporting HEX's market cap and associated rank. (Doc. 105 at 33 ¶ 181.) BAM is alleged to have participated in this manipulation by directing consumers to CMC's website. (*Id.* ¶ 182.) However, these allegations do not give rise to a private right of action under the CEA.

The CEA affords a private right of action in "four circumstances, each of them explicitly transactional in nature." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014) (citing 7 U.S.C. § 25(a)(1)(A)–(D)). The Court focuses on the two circumstances Plaintiff argues are implicated here and are set forth in § 25 as follows:

> (1) Any person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the [following] transactions . . .
>
> (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;
>
> (C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of . . .
>
> (iii) an interest or participation in a commodity pool.

§ 25(a)(1)(B), (C)(iii).

CMC argues that the foregoing circumstances are implicated because Plaintiff "made spot market purchases and sales of HEX . . . which cannot support a private CEA claim." (Doc. 107 at 11.) A spot market trade is the immediate exchange of a commodity for cash. *See Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 241 (5th Cir. 2010); *see also* Tim Smith, *Spot Market: Definition, How It Works, and Example*, Investopedia (June 13, 2025), https://www.investopedia.com/terms/s/spotmarket.asp ("The spot market refers to the trade of financial instruments for immediate payment and delivery. . . . A futures contract, on the other hand, is based on the payment and delivery of the underlying

asset at a future date."). Courts generally find that spot market purchases do not give rise to a private right of action under the CEA. *See, e.g.*, *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 975 (4th Cir. 1993) ("The CEA . . . regulate[s] only futures and options and never spot transactions or cash forwards."); *BDI Cap., LLC v. Bulbul Invs. LLC*, 446 F. Supp. 3d. 1127, 1135 (N.D. Ga. 2020) (noting that "cash or 'spot' purchasers of" Bitcoin did not have a claim under § 25).

Plaintiff does not contest that spot market purchasers do not have a private right of action under the CEA. Instead, Plaintiff contends that his HEX trades constituted the purchase and sale of an interest or participation in a commodity pool under § 25(a)(1)(C)(iii). (Doc. 108 at 6.) Alternatively, Plaintiff argues that his HEX trades should be construed as a "contract of sale of any commodity for future delivery" under § 25(a)(1)(B). (Doc. 108 at 7.) The Court considers each argument in turn.

The Court first evaluates whether Plaintiff's HEX trades implicate § 25(a)(1)(C)(iii). To start, the Amended Complaint does not plainly allege that trading HEX constituted participation in a "commodity pool." However, Plaintiff argues in his briefing that HEX is a commodity pool because its "staking/lock-up mechanics operate as a pooled vehicle in that participants commit tokens to a shared protocol and returns are determined collectively by that pool's rules and exposure to HEX's commodity-price dynamics." (Doc. 108 at 6.)

Under the CEA, "[t]he term 'commodity pool' means any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." 7 U.S.C. § 1a(10)(A). As noted, a manipulation claim can be brought by a claimant "who purchased from or sold to [the defendant] or placed through [the defendant] an order for the purchase or sale of . . . an interest or participation in a commodity pool." § 25(a)(1)(C)(iii).

To start, Plaintiff neither dealt with CMC nor BAM in trading HEX. That aside, Plaintiff fails to establish that trading HEX constitutes either the purchase or sale of an interest or participation in a commodity pool. To start, the Amended Complaint only

alleges that HEX is a commodity, not a commodity pool. (Doc. 105 at 33 ¶ 180.) Additionally, Plaintiff does not explain how HEX's "staking/lock-up mechanics" transform HEX—a cryptocurrency—into an "investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests." § 1a(10)(A). The Amended Complaint does not describe HEX's staking mechanics or explain how those mechanics make HEX a commodity pool rather than a single commodity. Indeed, commodity pools are typically "organized *in the form of a business entity* that limits the liability of individual investors." *Commodity Futures Trading Comm'n v. Equity Fin. Grp. LLC*, 572 F.3d 150, 156 (3d Cir. 2009) (emphasis added). The Court struggles to map this definition on to a cryptocurrency merely because it uses a proof-of-stake consensus mechanism.

Similarly, Plaintiff fails to establish that his HEX trades constituted futures contracts under § 25(a)(1)(B). Plaintiff argues, albeit confusingly, that "HEX transactions involved lock-ups, delayed ability to transfer/unlock, or settlement/valuation keyed to a later time—as not only is typical in token ecosystems, but Cox specifically pleaded (CITE_— [sic] they are plausibly 'contracts of sale . . . for future delivery' under § 25(a)(1)(B)." (Doc. 108 at 7.) Again, the Amended Complaint does not contain the foregoing description of HEX transactions. More importantly, the Amended Complaint does not allege that Plaintiff "bought or sold [HEX] at a specified price and fixed quantity for future delivery." *Commodity Futures Trading Comm'n v. Int'l Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 310 (E.D.N.Y. 2004). Indeed, the *sine qua non* of a futures contract is that there is a *future* obligation to make or take delivery of a commodity. *See id.* Plaintiff fails to allege that Defendants bought or sold HEX under these conditions. Instead, Plaintiff appears to allege that HEX trades are future contracts based on its staking mechanics. Again, the Amended Complaint does not allege, nor does Plaintiff meaningfully explain, how a staking consensus mechanism makes HEX trades futures contracts under the CEA. *See Berk v. Coinbase, Inc.*, No. 18-CV-01364, 2018 WL 5292244, at *2 (N.D. Cal. Oct. 23, 2018) ("Because Berk used Coinbase to purchase

Bitcoin Cash, rather than to make a contract to purchase Bitcoin Cash at a specific date in the future, he cannot maintain a claim under the CEA.").

Accordingly, the Court will dismiss Plaintiff's CEA claims, Counts I and II, without prejudice. At bottom, Plaintiff does not plausibly allege that trading HEX gives rise to a private right of action under the CEA. Thus, the Court need not consider whether the Amended Complaint otherwise plausibly pleads a manipulation claim or strict liability claim under the CEA.

### B. Arizona Consumer Fraud Act (Counts III and IV)

The Court next addresses Plaintiff's claims proceeding under the ACFA. (Doc. 105 at 39.)

> The ACFA provides:
> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A). "[T]o succeed on a claim of consumer fraud, a plaintiff must show (1) a false promise or misrepresentation made in connection with the sale or advertisement of 'merchandise,' and (2) consequent and proximate injury resulting from the misrepresentation." *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 953 (Ariz. 2016). The parties do not dispute that HEX constitutes "merchandise" under the ACFA. "An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information." *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004).

Plaintiff alleges that he "relied on [CMC] to apprise [him] of HEX's true ranking and would not have sold HEX at the prices [he] did, if at all, had [CMC] apprised [him] of HEX's true ranking." (Doc. 105 at 41 ¶ 245.) BAM participated in this scheme by holding CMC "out as an objective and reliable source of information that consumers should rely on in making their cryptocurrency trading decisions." (*Id.* at 40 ¶ 236.) BAM did so "to drive traffic to its exchange and thereupon sold various cryptocurrencies at prices and/or

volumes that had been artificially inflated by [CMC's] market manipulation." (*Id.*)

Plaintiff fails to state an ACFA claim against either CMC or BAM. Ultimately, the gravamen of Plaintiffs ACFA claim is that BAM directed consumers to CMC, which misrepresented HEX's market cap and its associated ranking, thereby causing Plaintiff to sell HEX at a loss on a third-party cryptocurrency exchange. (Doc. 105 at 22 ¶¶ 99, 101, 41 ¶ 245.) Plaintiff's allegations are too attenuated to support an ACFA claim.

Even assuming CMC's ranking of HEX constitutes a deceptive advertisement,[3] "false or deceptive advertisement[s] must [be] related to a sale *between the parties*." *Williams v. TMC Health*, No. CV-23-00434-TUC-SHR, 2024 WL 4364150, at *5 (D. Ariz. Sep. 30, 2024) (citation modified) (emphasis added). As established, CMC is not a trading platform, thus Plaintiff neither bought nor sold HEX on or through CMC. Accordingly, an ACFA claim cannot be maintained against CMC because Plaintiff never traded HEX with or through CMC.

For this reason, an ACFA claim also cannot be maintained against BAM because, in Plaintiff's own words, "HEX is not traded on [BAM]." (Doc. 105 at 15 ¶ 63.) Accordingly, Plaintiff's separate claim of control person liability against BAM, to the extent such a cause of action even exists under the AFCA, necessarily fails because such claims require an underlying violation. *See Holland v. CryptoZoo Inc.*, No. 1:23-CV-00110-ADA-RCG, 2025 WL 2493064, at *16 (W.D. Tex. Aug. 25, 2025) (discussing control person liability claim in the context of the Securities Exchange Act). Thus, the Court will dismiss Plaintiff's ACFA claims, Counts III and IV, without prejudice.

### C. The Sherman Act (Counts V and VI)

Finally, the Court addresses Plaintiff's claims proceeding under the Sherman Act § 2, 15 U.S.C. § 2. (Doc. 105 at 44.) Plaintiff accuses BAM and CMC of monopolization, and in the alternative, attempted monopolization.

---

[3] An "advertisement" is an "attempt by publication, dissemination, solicitation or circulation, oral or written, to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise." A.R.S. § 44-1521(1). The Court is dubious that CMC ranking HEX, even falsely, could constitute an "advertisement" under this definition; CMC and BAM did not deal in HEX.

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize" a market. 15 U.S.C. § 2. Monopolization claims have two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). "The second element requires that the plaintiff 'show that the defendant acquired or maintained its monopoly through "anticompetitive conduct."'" *AliveCor, Inc. v. Apple Inc.*, No. 24-1392, 2026 WL 61304, at *4 (9th Cir. Jan. 8, 2026) (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004)). "Anticompetitive conduct consists of acts that tend to impair the opportunities of rivals and do not further competition on the merits or do so in an unnecessarily restrictive way." *Id.* (citation modified).

Plaintiff alleges that CMC and BAM maintained a 70% market share in the "market for cryptocurrency ranking and information services." (Doc. 105 at 28 ¶ 154, 29 ¶ 158.) Plaintiff asserts that CMC "engaged in the following anticompetitive conduct":

> (a) artificially suppressing HEX's ranking on [CMC] despite verified market capitalization data that would place HEX among the top ten cryptocurrencies; (b) locking HEX's while allowing other cryptocurrencies to move freely based on market performance; (c) manipulating ranking methodologies post-acquisition to favor Binance affiliated products such as Binance Coin; and (d) using [CMC's] dominant position to steer users toward Binance exchanges while providing false or misleading ranking information.

(*Id.* at 30–31 ¶ 168.) Plaintiff goes on to allege that the foregoing conduct "constitutes willful maintenance of monopoly power" because it:

> (a) creates artificial barriers preventing competitors from reaching consumers based on legitimate market metrics; (b) leverages dominance in the cryptocurrency information market to maintain and extend market power; (c) excludes competition through manipulation rather than superior service or innovation; and (d) lacks any legitimate business justification.

(*Id.* at 31 ¶ 169.) Plaintiff was injured by this behavior because it caused Plaintiff to sell HEX for less than he otherwise would have received. (*Id.* at 32 ¶ 173.)

Plaintiff's monopolization claims fail.  To start, it is unclear how BAM monopolized or attempted to monopolize the market for cryptocurrency ranking and information services.  As BAM argues in its motion, "[n]one of the Sherman Act allegations identify BAM.  Only CMC is alleged to have monopolized or attempted to monopolize the 'relevant antitrust market.'"  (Doc. 106 at 21.)  Plaintiff does not contest this assertion in his Response; neither does Plaintiff materially respond to BAM's arguments seeking dismissal of the Sherman Act claims asserted against it.  (Doc. 109 at 4.)  *See Segura v. City of La Mesa*, 647 F. Supp. 3d 926, 934 (S.D. Cal. 2022) ("declining to *sua sponte* decide an issue not specifically briefed" and noting that "it is not the Court's role to make arguments for any party" (citation modified)).  At bottom, the Amended Complaint alleges that BAM is an exchange affiliated with CMC, but it does not own CMC.  (Doc. 105 at 2 ¶ 5.)  This allegation, by itself, does not plausibly allege that BAM violated § 2.  Given the lack of specificity in the Amended Complaint, and Plaintiff's sparse briefing on the matter, the Court will dismiss the monopolization and attempted monopolization claims asserted against BAM without prejudice.

The Court thus turns to the antitrust claims asserted against CMC.  For the purposes of this Order, the Court assumes that the Amended Complaint plausibly establishes that CMC enjoys a monopoly power in the market for cryptocurrency ranking and information services.  The Amended Complaint alleges that CMC controls 70% of this market and "has more users than any other product in the crypto space."  (Doc. 105 at 5 ¶ 18; 29 ¶ 158.)  The Amended Complaint also outlines multiple barriers to enter the relevant market, including that CMC is backed by Digital Anchor, one of the largest cryptocurrency exchanges.  (*Id.* at 29 ¶¶ 159–60.)  These allegations are sufficient, at this juncture, to plausibly establish that CMC has a monopoly power in the relevant market.  *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part rev'd in part and remanded on other grounds*, 67 F.4th 946 (9th Cir. 2023) (noting that 65% market share and evidence of significant barriers to entry can establish monopoly power).

However, Plaintiff fails to plausibly allege that CMC maintained its monopoly

power through anticompetitive conduct. As noted, anticompetitive conduct impairs rivals' opportunities and does not further competition on the merits. *See AliveCor, Inc.*, 2026 WL 61304, at *4. At bottom, Plaintiff alleges that CMC primarily engaged in anticompetitive conduct by mispresenting the market cap and ranking of a single cryptocurrency. (Doc. 105 at 30–31 ¶ 168.) While this might indirectly disrupt the market for HEX, it is unclear what bearing CMC's alleged behavior has on the market for cryptocurrency ranking and information services. Plaintiff does not offer any tenable explanation as to how CMC's ranking of HEX broadly precluded competitors from being able to rank or provide information about cryptocurrencies generally. *See Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353 (Fed. Cir. 1999) (noting that anticompetitive "conduct must be directed toward competitors and must be intended to injure competition").

Additionally, Plaintiff fails to allege that he suffered a requisite antitrust injury. *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (noting that an "antitrust injury" is necessary to give rise to antitrust standing). "[I]n assessing alleged antitrust injuries, courts must focus on anticompetitive effects in the market where competition is allegedly being restrained." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citation modified). In other words, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt.*, 190 F.3d at 1057.

Plaintiff's alleged injury is that he traded HEX at lower prices on cryptocurrency exchanges. (Doc. 105 at 32 ¶ 173.) CMC is not a cryptocurrency exchange, nor does it direct users to such an exchange to trade HEX. Thus, CMC is not a competitor in these markets. Accordingly, the Court is not convinced that Plaintiff suffered an injury in the market for cryptocurrency ranking and information services. While his injury might be related to that market, or even flow from that market, he must experience an injury in the relevant market. *See Am. Ad Mgmt.*, 190 F.3d at 1057. Because Plaintiff fails to plausibly

allege as much, the Court will dismiss Counts V and VI without prejudice.

### D. Communications Decency Act

The Court briefly addresses CMC's argument that it is immune from liability under section 230 of Communications Decency Act, 47 U.S.C. § 230. "Section 230 'immunizes providers of interactive computer services against liability arising from content created by third parties.'" *Benedict v. Google LLC*, No. CV-23-02392-PHX-JJT, 2024 WL 3427161, at *4 (D. Ariz. July 16, 2024) (*Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016)). "This grant of immunity applies only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Hous. Council v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (quoting § 230(f)(3)).

Plaintiff contends that CMC is an information content provider. (Doc. 108 at 18.) "If [a website] passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that [the website] creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider." *Id.* Plaintiff sufficiently alleges that CMC is an information content provider. Plaintiff alleges that CMC "artificially suppressed HEX's value" and "inflat[ed] the price of one or more other cryptocurrencies." (Doc. 105 at 23 ¶¶ 109, 111.) At this juncture, this is sufficient to establish that CMC did more than passively display content created by third parties. However, this argument is not altogether foreclosed. Accordingly, § 230 does not affect the outcome of this Order.

### IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED dismissing** the Amended Complaint without prejudice (Doc. 105).

…

…

**IT IS FURTHER ORDERED granting** Plaintiff leave to amend the Amended Complaint. Plaintiff may file a Second Amended Complaint within thirty (30) days of the date of this Order.

Dated this 17th day of February, 2026.

_____
Honorable Susan M. Brnovich
United States District Judge