**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Ryan Cox,<br>Plaintiff,<br>v.<br>CoinMarketCap OpCo LLC, et al.,<br>Defendants. | No. CV-21-08197-PCT-SMB<br>**ORDER** |

The Court now considers CoinMarketCap OpCo., LLC's ("CMC") Motion to Dismiss (Doc. 118) and Defendants BAM Trading Services Inc. d/b/a Binance.US's ("BAM") Motion to Compel Arbitration and Motion to Dismiss (Doc. 119). The Court rules as follows.

## I. BACKGROUND

At a high level, Plaintiff Ryan Cox alleges that CMC and BAM unlawfully suppressed the value of HEX cryptocurrency. (Doc. 112 at 1.) CMC is a cryptocurrency price-tracking website and BAM is an affiliated cryptocurrency exchange. (*Id.*) Plaintiff filed a First Amended Class Action Complaint (the "FAC") alleging violations of the Commodity Exchange Act ("CEA"), the Arizona Consumer Fraud Act ("ACFA"), and the Sherman Act. (*See* Doc. 105.) The Court dismissed the FAC without prejudice. (Doc. 112.) Plaintiff thereafter filed a Second Amended Class Action Complaint ("SAC") (Doc. 114), which reasserts violations of the ACFA and the Sherman Act and adds a variety of state law claims. (*See id.*)

## II. CMC'S MOTION TO DISMISS

The Court begins with CMC's Motion. CMC argues that the Court lacks personal jurisdiction over CMC without the CEA claim. (Doc. 118 at 5.) The Court agrees.

"For a court to exercise personal jurisdiction over a defendant, there must be an applicable rule or statute that potentially confers jurisdiction over the defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004) (citation modified). "[A] federal court obtains personal jurisdiction over a defendant if it is able to serve process on him." *Id.* (citation modified).

Ordinarily, cases proceed under Federal Rule of Civil Procedure 4(k)(1)(A). *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." (citing Fed. R. Civ. P. 4(k)(1)(A))). In such cases "personal jurisdiction over a defendant is proper if it is permitted by [the forum state's] long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). "Arizona exerts personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution." *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (citation modified). Thus, in Arizona, courts "can exercise personal jurisdiction if the defendant has sufficient contacts *with the state* 'such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Id.* (emphasis added) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

This case is unique because, until this point, personal jurisdiction was grounded in Rule 4(k)(1)(C). Rule 4(k)(1)(C) provides that "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Previously, Plaintiff asserted claims under the CEA, which permits "nationwide service of process." *Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822, 833 (9th Cir. 2024). "In a statute providing for nationwide service of process, the inquiry to determine minimum contacts is whether the defendant has acted within any district of the United States or

sufficiently caused foreseeable consequences in this country." *Id.* at 834. On an earlier appeal in this matter, the Ninth Circuit found that CMC had "sufficient contacts with the United States to satisfy due process." *Id.* However, Plaintiff no longer asserts claims under the CEA.

Without the CEA claims, CMC contends that the Court must evaluate its contacts with Arizona only rather than the United States generally. (Doc. 118 at 14–15.) CMC argues that it does not have the requisite contacts with Arizona. (*Id.* at 15–16.) Plaintiff does not expressly disagree with this latter point; instead, Plaintiff contends that personal jurisdiction still exists because the Clayton Act § 12, like the CEA, "supplies the nationwide-service hook for the Sherman Act Claims." (Doc. 120 at 7 (citation modified).)

Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. The Ninth Circuit has "held that the relevant forum with which a defendant must have minimum contacts in a suit brought under Section 12 of the Clayton Act is the United States." *Action Embroidery*, 368 F.3d at 1180 (citation modified).

Nonetheless, CMC contends that "the Clayton Act's service provision applies only to corporations" and thus "does not apply to unincorporated entities, such as LLCs like CMC." (Doc. 124 at 9 (emphasis omitted).) The Court agrees.

"[T]ime and again courts have cabined Section 12's applicability to corporations." *GovernmentGPT Inc. v. Axon Enter. Inc.*, 769 F. Supp. 3d 959, 978 (D. Ariz. 2025) (collecting cases). Indeed, in *GovernmentGPT*, the court expressly found that "[b]ased upon the statute's plain language, and the supporting persuasive case law, there is no question that Section 12 does not apply to [LLCs]." *Id.* at 979. Accordingly, for claims brought under the Clayton Act against LLCs, the question of "whether the Court has personal jurisdiction . . . must be determined through a traditional minimum contacts analysis." *Id.*

The Court previously conducted an extensive Arizona-minimum-contacts analysis and determined that CMC has insufficient contacts with Arizona. (*See generally* Doc. 84.) CMC argues that the SAC does not add any new allegations that materially impact that analysis. (Doc. 118 at 15.) As noted, Plaintiff does not argue otherwise and only argues that personal jurisdiction exists under a nationwide-contacts analysis. (Doc. 120 at 6–7.)

The Court agrees with CMC and sees no reason to reconduct an exhaustive traditional minimum contacts analysis as to Arizona. Although the Ninth Circuit vacated this Court's previous Order, it did so based on CMC's contacts with the United States. *See generally Cox*, 112 F.4th 822. The Ninth Circuit found that the Arizona contact analysis was inapplicable but did not otherwise opine on the propriety of that analysis. *See id.* Given that Plaintiff does not argue that CMC has sufficient contacts with Arizona, the Court's previous analysis of CMC's contacts with Arizona applies with equal force. In short, the SAC does not allege that CMC specifically targeted Arizona or otherwise purposefully availed itself of Arizona. Moreover, there is no allegation that CMC's conduct was tethered to Arizona in any meaningful way. At bottom, the "sole connection" between this case and Arizona is that Plaintiff lives there; this is insufficient to establish personal jurisdiction. *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1145 (9th Cir. 2017).

Because personal jurisdiction does not exist for the Sherman Act claims, the Court lacks personal jurisdiction over the other claims asserted against CMC. *See Action Embroidery*, 368 F.3d at 1180 ("Personal jurisdiction must exist for each claim asserted against a defendant."). Indeed, the doctrine of pendent personal jurisdiction only applies "to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.*

Accordingly, CMC will be dismissed from this lawsuit with prejudice.

## III. BAM'S MOTION TO COMPEL ARBITRATION

The Court turns next to BAM's Motion to Compel Arbitration. The Court first assesses whether a valid arbitration agreement exists among the parties. The Court then

determines what version of that agreement applies here. Then, Court considers whether the agreement delegates the threshold issue of arbitrability to an arbitrator. Finally, the Court analyzes whether BAM waived its right to arbitrate.

**A. Legal Standard**

The Federal Arbitration Act ("FAA") "governs arbitration agreements in 'contract[s] evidencing a transaction involving commerce.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1193 (9th Cir. 2024) (alteration in original) (quoting 9 U.S.C. § 2)). The FAA "provides that written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting § 2). "Because an arbitration agreement is a contract like any other, it may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023) (citation modified). "The FAA limits federal court review of arbitration agreements to two gateway arbitrability issues: (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue." *Id.* (citation modified).

However, "parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). If the arbitrability question has been delegated to an arbitrator, it "limits the issues that a court may decide." *Fli-Lo Falcon*, 97 F.4th at 1194 (citation modified). In such circumstances, a "court need not conduct further inquiries beyond the existence of the arbitration agreement." *Id.* Instead, "the only remaining question is whether the particular agreement *to delegate* arbitrability—the Delegation Provision—is itself unconscionable." *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015) (emphasis in original). Indeed, "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court *may not decide the*

*arbitrability issue*." *Henry Schein*, 586 U.S. at 69 (emphasis added).

**B. Whether an Arbitration Agreement Exists**

The Court first assesses whether a valid arbitration agreement exists between BAM and Plaintiff. *See Fli-Lo Falcon*, 97 F.4th at 1194. "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network*, LLC, 30 F.4th 849, 855 (9th Cir. 2022). The parties agree that California law governs this dispute. (Doc. 119 at 7; Doc. 121 at 13.)

"[E]lemental principles of contract formation apply . . . to contracts formed online." *Berman*, 30 F.4th at 855–56. "Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id.* at 856. "To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements . . . have devised rules to determine whether meaningful assent has been given." *Id.* Absent a consumer having actual knowledge of an agreement, "an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* These elements are met here.

Plaintiff made a BAM account and, during the account creation process, Plaintiff was required to a check a box that stated: "I am over age 18, and I agree to Binance.US Terms of Use." (Doc. 119 at 11; Doc. 121 at 9.) The phrase "Binance.US Terms of Use" appeared in yellow and was a hyperlink that would bring users to the Terms. (Doc. 119 at 8; Doc. 121 at 9.) Plaintiff argues that "a generic terms-of-use checkbox with a buried hyperlink and no notice that the Terms contained an arbitration clause—does not constitute reasonably conspicuous notice . . . and the checkbox action does not constitute unambiguous manifestation of assent to arbitration specifically." (Doc. 121 at 9.)

Plaintiff is mistaken. "[I]t is permissible to disclose terms and conditions through a hyperlink" so long as the hyperlink is "readily apparent." *Berman*, 30 F.4th at 857. To be "readily apparent," the hyperlink "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* This standard is met here.

As noted, the hyperlink was offset in a different color, it was "not hidden or obscured," "[t]he notice [was] clear and legible," and the hyperlink otherwise "contrasted against the surrounding white background and adjacent black text." *See Patrick v. Running Warehouse*, 93 F.4th 468, 477 (9th Cir. 2024). This is unlike *Berman*, wherein"the text disclosing the existence of the terms and conditions was 'printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye.'" *See Patrick*, 93 F.4th at 477(quoting *Berman*, 30 F.4th at 856–57).

Plaintiff assented to these terms. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. This standard is met here because Plaintiff, to create a BAM account, had to click a box that acknowledges: "I am over age 18, and I agree to Binance.US Terms of Use." (Doc. 119 at 11.)

Accordingly, Plaintiff assented to BAM's Terms of Use.

**C. What Version of the Arbitration Agreement Applies**

The Court next determines what version of the Terms of Use apply. Here, Plaintiff created his BAM Account in March 2020. (Doc. 119 at 12; Doc. 121 at 9.) The Terms of Use were periodically updated, and BAM contends that the May 2023 version of the Terms of Use applies here. (Doc. 119 at 14.) The Court agrees.

Here, Plaintiff does not dispute he received a May 2023 email from BAM with the subject: "Updates to our Terms and Policies." (Doc. 119-1 at 219.) The email reads in pertinent part as follows:

> We are updating our Terms of Use and Privacy Policy, including our Consumer Privacy Notice, with the changes taking effect on May 5, 2023.
>
> As part of our commitment to offer you safe, secure, and reliable service, we periodically review and update our Terms and Policies. The purpose of this communication is to provide you greater transparency and clarity around these updates. Notable changes include the following:
>
> . . . .
>
> We encourage you to familiarize yourself with these changes by reviewing the updated Terms of Use and Privacy Policy. These updates will go into effect for new customers immediately and existing customers on May 5, 2023.
>
> By continuing to use the Binance.US platform from that date onward, you agree and will be subject to our updated Terms of Use and Privacy Policy. Customers who do not wish to agree to the updated Terms of Use and Privacy Policy can close their Binance.US account at any time, as long as their account is in good standing.

(*Id.*)

The phrases "Terms of Use" and "Privacy Policy" were hyperlinked in blue. (*Id.*) The listed "notable changes" do not mention arbitration. (*See id.*)

This email was sufficient to put Plaintiff on inquiry notice of any updated terms. To start, Plaintiff was required to submit his email when signing up for a BAM account, (Doc. 119 at 11), and thus "should have expected to receive relevant updates there while the account was active." *Ireland-Gordy v. Tile, Inc.*, No. 25-403, 2026 WL 594859, at *3 (9th Cir. Mar. 3, 2026). Moreover, the email is "clear and legible"; "[t]he subject line clearly stated that [BAM] was updating its Terms"; and "the body contained a hyperlink to the . . Terms in bold, blue text which contrasted against the white background." *See id.* And "[a]lthough the email did not say specifically that the arbitration agreement would be updated, reasonable notice does not require the email to discuss every revision." *Id.*

Plaintiff's arguments to the contrary are thin. Plaintiff merely argues that "BAM's evidentiary submissions—the Miller Declaration's characterizations of subject lines, body text, and hyperlinks—are contested factual assertions a Rule 12 motion cannot resolve."

(Doc. 121 at 10.) Plaintiff goes on to argue that whether the May 2023 was sufficient to put him on inquiry notice "are inquiries inappropriate for resolution before discovery and an evidentiary hearing on formation." (*Id.*) However, Plaintiff does not point to a genuine dispute of fact that would preclude this Court from opining on the sufficiency of the May 2023 email. Plaintiff does not dispute that he received the email and he does not dispute its contents. Thus, whether the May 2023 was sufficient to put Plaintiff on inquiry notice of its contents is a legal question ripe for resolution. *See, e.g.*, *Ireland-Gordy*, 2026 WL 594859, at *3.

**D. Whether There is an Enforceable Delegation Provision**

Finally, the Court considers whether the May 2023 Terms of Use delegate the threshold question of arbitrability to an arbitrator. As indicated, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). The parties did so here.

The May 2023 Terms of Use provide:

> **Delegation**. Any dispute between BAM and You regarding the construction, interpretation, or application of this arbitration provision, including the enforceability, severability, revocability, scope or validity of this arbitration provision, shall be decided by an arbitrator and not by a court or judge.

(Doc. 119 at 20; Doc. 119-1 at 214.) This provision "clearly and unmistakably" delegates the issue of arbitrability to an arbitrator. *See AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (emphasis omitted). Thus, "the only remaining question is whether the particular agreement *to delegate* arbitrability—the Delegation Provision—is itself unconscionable." *Brennan*, 796 F.3d at 1132 (emphasis in original).

A delegation provision is unconscionable if it is "so one-sided as to shock the conscience." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016) (citation modified). "Under California law, unconscionability has both a procedural and a substantive' element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *See Gutierrez v. FriendFinder Networks Inc.*, No. 18-CV-05918-BLF, 2019 WL 1974900, at *10 (N.D.

Cal. May 3, 2019) (citation modified). "A contract must be both substantively and procedurally unconscionable for a court to find the contract unconscionable." *Id.* "However, the procedural and substantive unconscionability need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." *Id.* (citation modified).

Plaintiff makes a variety of unconscionability arguments, but the Court only considers those arguments directed at the delegation provision. *See Id.* at *11 ("The Court declines to address Plaintiff's third argument because it is not specific to the delegation provision." (citation modified)). Regarding the delegation provision, Plaintiff argues that it is an "adhesion contract presented without genuine opportunity to negotiate" and that "the delegation clause strips courts of any gatekeeping role over arbitrability in favor of an arbitrator chosen under a process BAM controls." (Doc. 121 at 13.) Plaintiff's arguments are unavailing.

The Court begins with procedural unconscionability. Even accepting as true the adhesive nature of the delegation provision, Plaintiff does not make any further arguments regarding procedural unconscionability. Accordingly, there is only a slight degree of procedural unconscionability here; "the Ninth Circuit has made clear that 'the adhesive nature of a contract, without more, would give rise to a low degree of procedural unconscionability at most.'" *Gutierrez*, 2019 WL 1974900, at *10 (quoting *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261–62 (9th Cir. 2017)). Accordingly, the delegation provision can only be deemed unconscionable if there is a high degree of substantive unconscionability. *See id.* at *10 (discussing the sliding scale approach to determining unconscionability).

Again, regarding substantive unconscionability, Plaintiff argues that "the delegation clause strips courts of any gatekeeping role over arbitrability in favor of an arbitrator chosen under a process BAM controls." (Doc. 121 at 13.) Frankly, Plaintiff describes the

very purpose of a delegation provision, that is, to "delegate threshold arbitrability questions to [an] arbitrator." *Henry Schein*, 586 U.S. at 69. Courts are not stripped of "any gatekeeping role" under these circumstances. Indeed, courts still must determine: whether a valid arbitration agreement exists; whether that agreement contains a delegation provision; and whether that provision is unconscionable. *See id.*

Moreover, Plaintiff does not cite any authority suggesting that an "arbitrator chosen under a process BAM controls" renders the delegation provision unconscionable. Instead, Plaintiff cites to *Armendariz v. Foundation Health Psychare Services, Inc.*, 6 P.3d 669 (Cal. 2000) for the proposition that "lack of mutuality renders arbitration term unconscionable." (Doc. 121 at 13.) However, *Armendariz* stands for a narrower proposition: "the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself." 6 P.3d at 118. Plaintiff does not argue that such circumstances are implicated here.

Accordingly, the Court finds that the delegation provision is not unconscionable. Thus, the threshold issue of arbitrability must be decided by an arbitrator and this Court "may not decide [the] arbitrability question." *Henry Schein*, 586 U.S. at 530.

**E. Waiver**

Finally, the Court addresses whether BAM waived its right to arbitrate. "Waiver of the right to arbitration falls into the category of gateway questions that are presumptively for courts to decide but can be delegated." *Ensambles Hyson, S.A. de C.V. v. Sanchez*, 718 F. Supp. 3d 1258, 1270 (S.D. Cal. 2024). There is no argument that waiver has been delegated. "[T]he test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right." *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457 468 (9th Cir. 2023).

To start, the Court finds that BAM did not waive the right to arbitrate Counts 5, 8, and 9—the newly asserted state law claims against BAM. (*See* Doc. 114.) Generally,

courts find that even "a waived right to arbitration can be reasserted as to the newly added claims." *Lackie Drug Store, Inc. v. OptumRx, Inc.*, 143 F.4th 985, 994 (8th Cir. 2025) (collecting cases). In short, "[a] party cannot waive defenses to claims that have not been asserted." *Id.* at 995.

The Court also finds that BAM did not waive the right to arbitrate the ACFA claims because it could not arbitrate those claims in the first instance. *See Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986) ("[T]here could be no waiver here because there was no existing right to arbitration."). Until this point, the ACFA claims were not predicated on any interaction between Plaintiff and BAM. Instead, the ACFA claims were predicated on HEX trades; HEX is not traded on BAM. (Doc. 112 at 9.) Accordingly, the Court dismissed the ACFA claims because there was not a "sale between the parties." (*Id.* (emphasis omitted) (quoting *Williams v. TMC Health*, No. CV-23-00434-TUC-SHR, 2024 WL 4364150, at *5 (D. Ariz. Sep. 30, 2024) (citation modified).) The SAC, for the first time, makes clear that "[t]he merchandise at issue . . . is Binance Coin, which Plaintiff purchased on BAM's exchange." (Doc. 114 at 43.) Thus, BAM did not waive the right to arbitrate the ACFA claims because those claims only became arbitrable in the SAC.[1]

However, the Court finds that BAM waived any right to arbitrate the Sherman Act claims.[2] Unlike the ACFA claims, the Sherman Act claims remained similar between the FAC and the SAC. BAM nonetheless contends that it lacked knowledge of its ability to arbitrate because it "only knows what Plaintiff pleaded" and Plaintiff did not previously plead or indicate that he had a BAM account. (Doc. 125 at 13.) BAM does not cite any authority supporting this assertion. Instead, BAM cites *Lackie* and *Forby v. one Technologies, L.P.* 13 F.4th 460 (5th Cir. 2021); but these cases stand for the more modest

---

[1] Alternatively, courts recognize that even "a waived right to compel arbitration is 'revived'" "when an amended complaint unexpectedly changes the scope or theory of the plaintiff's claims." *Lackie*, 143 F.4th at 995 (citation modified) (collecting cases).

[2] The Court questions whether the Sherman Act claims are arbitrable under BAM's Terms of Use. However, for the purposes of this Order, the Court assumes that the SAC's Sherman Act claims are arbitrable. Whether this assumption is correct is ultimately immaterial because the Court concludes that arbitration is not appropriate.

proposition that a party cannot waive arbitration as to unpled claims. *See Lackie*, 143 F.4th at 995 (holding "that a waiver of arbitral rights only applies to claims that were actually pled"). The cited cases do not establish that a party can only be charged with knowledge of its own contractual relationships if those relationships are detailed in the pleadings. Indeed, courts overwhelmingly impute knowledge of a contractual right to arbitrate the contract's drafter. *See, e.g.*, *Christian v. ABM Onsite Servs.-W., Inc.*, No. CV 16-8493-MWF(PLAX), 2017 WL 11632815, at *4 (C.D. Cal. June 8, 2017) (collecting cases).

BAM still argues that "even if BAM knew that Plaintiff had a BAM account . . . , BAM did not know that Plaintiff asserted claims premised on use of his BAM account or services that would trigger the arbitration agreement." (Doc. 125 at 13.) This argument is only convincing as to the ACFA claims. BAM does not separately explain how the Sherman Act claims are premised on Plaintiff's use of his BAM account. As noted, for the purposes of arbitrability, the Sherman Act claims remain materially similar between the FAC and the SAC.

Accordingly, the Court will compel arbitration as to all claims asserted against BAM except for the Sherman Act claims—Counts 3 and 4.

## IV. BAM'S MOTION TO DISMISS

The Court now considers BAM's Motion to Dismiss as to the Sherman Act claims. As a general matter, Plaintiff's Response does not address BAM's arguments as to the Sherman Act. (*See generally* Doc. 121.) "In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (citation modified). Indeed, this Court has noted that failure to address an argument that a claim should be dismiss is "an independent basis for granting the motion to dismiss." *Simpson v. Mark E Hall PC*, No. CV-25-00081-PHX-SMB, 2025 WL 2531550, at *5 (D. Ariz. Sept. 3, 2025)

(citation modified).[3] Accordingly, the Court only briefly addresses the Sherman Act claims.

**A. Legal Standard**

To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Rule 8(a)(2). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This notice exists if the pleader sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility does not equal "probability," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility . . . .'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In ruling on a Rule 12(b)(6) motion to dismiss, the well-pleaded factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, legal conclusions couched as

---

[3] Previously the Court—in dismissing the FAC's Sherman Act claims against BAM—declined to address arguments left uncontested by Plaintiff. (*See* Doc. 112 at 11.) The Court specifically emphasized that "it is not the Court's role to make arguments for any party" and noted that it is may decline to "decide an issue not specifically briefed." (*Id.* (quoting *Segura v. City of La Mesa*, 647 F. Supp. 3d 926, 934 (S.D. Cal. 2022).)

factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). A court ordinarily may not consider evidence outside the pleadings when ruling on a Rule 12(b)(6) motion to dismiss. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

**B. Discussion**

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize" a market. 15 U.S.C. § 2. Monopolization claims have two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). "The second element requires that the plaintiff 'show that the defendant acquired or maintained its monopoly through "anticompetitive conduct."'" *AliveCor, Inc. v. Apple Inc.*, No. 24-1392, 2026 WL 61304, at *4 (9th Cir. Jan. 8, 2026) (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004)). "Anticompetitive conduct consists of acts that tend to impair the opportunities of rivals and do not further competition on the merits or do so in an unnecessarily restrictive way." *Id.* (citation modified).

Here, the SAC alleges that "[t]he relevant product market is the market for cryptocurrency ranking and information services." (Doc. 114 at 34.) It is apparent that the Sherman Act claims are directed primarily towards CMC. (*See generally id.*) Indeed, the Court previously dismissed the Sherman Act claims against BAM because there were not any specific allegations detailing how BAM violated the Sherman Act. (Doc. 112 at 11.) The SAC's attempt to remedy this defect is unavailing. The SAC adds the following

allegation:

> BAM participated in the anticompetitive maintenance of CMC's monopoly through its own independent conduct as a separate economic actor in the U.S. market. BAM is not alleged to have conspired with CMC. Rather, BAM is independently liable under § 2 because it willfully participated in maintaining CMC's monopoly power through its own acts: (a) entering into and maintaining a commercial arrangement under which BAM used CMC's manipulated rankings as its primary U.S. customer-acquisition tool; (b) holding CMC out to U.S. consumers as an objective information source while knowing or having reason to know of the manipulation; (c) profiting from the increased trading volumes in Binance-affiliated tokens; and (d) failing to require accurate rankings despite having the practical ability to do so.

The Sherman Act claims against BAM are seemingly predicated on this lone allegation.

This allegation is far too conclusory to plausibly establish that BAM violated the Sherman Act. In short, there are no allegations that BAM enjoyed a monopoly power in the market for cryptocurrency ranking and information services. Again, BAM is not alleged to have been a direct participant in the market for cryptocurrency ranking and information services. Instead, it appears that Plaintiff claims that BAM violated the Sherman Act based merely on its interactions with CMC. It is unclear—particularly given the lack of briefing from Plaintiff—whether BAM can be exposed to Sherman Act liability based on its use of CMC. Even if BAM could be, the SAC's allegations on the matter are far too scant for the Court to meaningfully understand the contours of this claim.

Given Plaintiff's repeated failure to address the deficiencies of his Sherman Act claims against BAM, the Court will dismiss this claim with prejudice.

## V. CONCLUSION

Accordingly,

**IT IS ORDERED granting** Defendant CMC's Motion to Dismiss (Doc. 118). CMC is dismissed from the case with prejudice.

**IT IS FURTHER ORDERED granting** Defendant BAM's Motion to Dismiss (Doc. 119) as to Counts 3 and 4 only. Counts 3 and 4 are dismissed with prejudice.

**IT IS FURTHER ORDERED granting** Defendant BAM's Motion to Compel

Arbitration (Doc. 119) as to all remaining Counts asserted against BAM. The case is stayed until arbitration is terminated. The parties are ordered to file a joint status report every 120 days until the arbitration is terminated. If the parties prefer to avoid this obligation, they may stipulate to dismiss this action without prejudice and that the defendant waives any statute of limitations defense based on the period the dispute is with the arbitrator.

Dated this 26th day of August, 2026.

Honorable Susan M. Brnovich
United States District Judge